OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court and the parties' briefs. Defendant-Appellant, Charles Patton, appeals the decision of the Jefferson County Court of Common Pleas that found him guilty of burglary and theft and sentenced him accordingly. Patton raises two issues on appeal.
 {¶ 2} First, Patton argues that his conviction should be reversed since the trial court admitted into evidence a statement Patton made to a police officer that the State failed to produce after a proper discovery request. However, a trial court should impose the least restrictive sanction when faced with a Crim.R. 16 violation. In this case, the prosecutor's violation of Crim.R. 16 was not willful, defense counsel had actual knowledge of the statement, and the trial court interrupted trial to hold a suppression hearing regarding the statement. It did not abuse its discretion by allowing the evidence to be introduced after taking these remedial steps.
 {¶ 3} Second, Patton claims his conviction is against the manifest weight of the evidence. Patton correctly argues that there is no direct evidence that he committed both of these offenses. However, the circumstantial evidence introduced at trial certainly supports the jury's verdict.
 {¶ 4} For these reasons, the trial court's judgment is affirmed.
 Facts {¶ 5} At about 5:30 p.m. on August 18, 2003, Deborah Walkup and her husband left home to go work at a store they owned. When they returned home at about 11:15 that night, they discovered that their back door had been kicked in and some items had been stolen. Because Patton and his friends, Joe Nicosia and Ronald Bone, had been seen in the area, the police immediately suspected them. Patrolman Jeffery Kamerer of the Wells Township Police Department had pulled those three over for speeding in the area less than an hour before and all three were wearing black. A few days later, an acquaintance of these men gave the police a box containing items stolen from the Walkups and reported that Bone had told her they were stolen. Patton was then arrested. After Patton was arrested, he was Mirandized by Patrolman Kamerer. Patton then told Patrolman Kamerer that he had been with Nicosia and Bone that night.
 {¶ 6} On October 1, 2003, the Jefferson County Grand Jury indicted Patton on one count of burglary and one count of theft. At the jury trial, the prosecution attempted to introduce Patton's statement to Patrolman Kamerer. The statement had not been provided in writing to Patton's counsel in response to a discovery request. After an extended sidebar and a suppression hearing, the trial court held that the State could introduce the statement. However, the prosecutor never again asked Patrolman Kamerer what Patton had told him after he was arrested.
 {¶ 7} The jury found Patton guilty of both counts. He was then sentenced to a total imprisonment of eighteen months for the offenses.
 Discovery Violation {¶ 8} Patton's second of two assignments of error on appeal argues:
 {¶ 9} "Pursuant to Criminal Rule 16, a trial court must exclude evidence at trial that has not been submitted to opposing counsel."
 {¶ 10} Patton claims the trial court erred by not excluding a statement he allegedly made to a police officer since that statement was not officially provided to counsel in the manner described by the Criminal Rules. Accordingly, he believes his conviction should be reversed.
 {¶ 11} Crim.R. 16 provides that a prosecutor shall produce, among other things, any statements by the defendant in the State's possession upon request. Crim.R. 16(A) (B)(1)(a). If the State fails to provide the required statements, then the trial court may take a variety of actions.
 {¶ 12} "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(E)(3).
 {¶ 13} A trial court has broad discretion when ruling on discovery motions. State v. Craft, 149 Ohio App.3d 176, 2002-Ohio-4481, ¶ 10. And Crim.R. 16(E)(3) gives a trial court a wide scope of discretion in determining a proper discovery sanction. State v. Edwards (1993),86 Ohio App.3d 550, 555. Thus, this court must review the trial court's decision in this matter for an abuse of discretion. An abuse of discretion connotes more than an error of law or judgment; it implies conduct that is unreasonable, arbitrary, or unconscionable. State v.Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 14} In this case, Patrolman Kamerer testified that he arrested and Mirandized Patton. The prosecutor then asked what Patton said in response to that. Before Patrolman Kamerer could respond, Patton's counsel objected and the trial court ordered a sidebar. During that sidebar, the prosecutor said that Patrolman Kamerer was going to testify that Patton was going to say, "Yeah, I was with those guys, f*** you." The parties and the trial court then engaged in an extensive discussion regarding whether the State had committed a discovery violation by failing to provide a written copy of that statement to defense counsel prior to trial.
 {¶ 15} At sidebar, defense counsel indicated he was never provided with a written copy of Patton's alleged statement. Nevertheless, counsel was present when Patton testified at the trial of one of his co-defendants and was asked if he made that statement. The trial court then concluded that Patton's counsel knew about the statement, even though it was not handed over in conformance with the Criminal Rules.
 {¶ 16} After the sidebar, the trial court ordered that the jury recess and held an impromptu hearing to determine whether the statement should be suppressed. Patrolman Kamerer testified in this hearing that Patton admitted, "Yes, I was with them and I don't give a f***," after he was Mirandized. At the conclusion of this hearing, the court allowed the prosecution to bring the issue up on cross-examination and/or rebuttal. But it also concluded that the State could introduce the evidence even if Patton did not testify as planned. Patton's trial counsel conceded that the State could ask questions related to Patton's prior testimony.
 {¶ 17} The issue did not arise again until Patton's cross-examination, where Patton denied making the statement. The prosecutor did not recall Partolman Kamerer as a rebuttal witness to contradict Patton's denial. Neither party referred to the alleged statement during closing arguments.
 {¶ 18} Given these facts, we conclude the trial court did not abuse its discretion since exclusion of the evidence is not the least restrictive sanction appropriate under these circumstances. "The philosophy of the Criminal Rules is to remove the element of gamesmanship from a trial." State v. Howard (1978), 56 Ohio St.2d 328, 333. Crim.R. 16 furthers this goal by "prevent[ing] surprise and the secreting of evidence favorable to one party." Lakewood v. Papadelis (1987),32 Ohio St.3d 1, 3. Accordingly, Crim.R. 16 allows a trial court to exclude evidence when necessary. But whenever a trial court is deciding whether and how to sanction a party for a discovery violation, it "must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery." Id. at paragraph two of the syllabus.
 {¶ 19} In this case, the prosecutor's failure to turn over this evidence was not willful. The prosecutor stated that he found out about the statement during the trial of Patton's co-defendant. The prosecutor stated that "it slipped my mind to send a copy of that statement to [Patton's counsel]" since he was in trial at the time.
 {¶ 20} The record also indicates that Patton's counsel knew this type of evidence existed since he sat in on the relevant portion of the co-defendant's trial. Thus, he had actual knowledge of this statement, even though it was not properly handed over in accordance with Crim.R. 16.
 {¶ 21} Finally, the trial court asked Patton's counsel what he would have done differently if he had known of the statement. Patton's counsel responded that he would have filed a motion to suppress the statement. The trial court then held a hearing on the admissibility of the statement.
 {¶ 22} In conclusion, the trial court did not abuse its discretion when managing this situation. The prosecution's failure to produce the statement was not willful, Patton's attorney knew about the issue since it was raised at the trial of Patton's co-defendant, and the trial court gave Patton the ability to challenge the admissibility of this evidence by holding a suppression hearing during trial. The trial court properly avoided imposing a more serious sanction under these circumstances. Patton's second assignment of error is meritless.
 Manifest Weight {¶ 23} In his remaining assignment of error, Patton argues:
 {¶ 24} "The jury verdict of guilty for the offenses of burglary and theft was against the manifest weight of the evidence."
 {¶ 25} When reviewing a manifest weight claim, this court's role is to examine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction.'State v. Getsy, 84 Ohio St.3d 180, 193, 1998-Ohio-0533. To do this, we sit as the "thirteenth juror," examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387, 1997-Ohio-0052. In making this analysis, we must be mindful that determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 26} "`The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Thompson at 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. Before this court can reverse a judgment on the basis that a verdict is against the manifest weight of the evidence, we must unanimously disagree with the fact-finder's resolution of any conflicting testimony. Id. at 389.
 {¶ 27} In this case, Patton was convicted of burglary, a violation of R.C. 2911.12(A)(3), and theft, a violation of R.C. 2913.02(A)(1). R.C.2911.12(A)(3) provides:
 {¶ 28} "(A) No person, by force, stealth, or deception, shall * * *
 {¶ 29} "(3) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense."
 {¶ 30} R.C. 2913.02(A)(1) provides:
 {¶ 31} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * *
 {¶ 32} "(1) Without the consent of the owner or person authorized to give consent."
 {¶ 33} In this case, Patton was accused of kicking open the back door of the Walkups' home and stealing some personal property from that home. The evidence supports this accusation.
 {¶ 34} The State's first witness was Mrs. Walkup. On August 18th, someone kicked in her backdoor and stole some personal property from her bedroom. She and her husband had been at work at their store since about 5:30 that evening and did not get home until about 11:15 p.m. She testified that at about 7:00 that night, Joe Nicosia came into her store with a funny look on his face. He then left and got into a car with Patton. She did not see either Nicosia or Patton later that night. She then identified the items which were stolen, including a package of cigarettes and cash, stated that their approximate value was $4300.00, and identified the items presented to her by the prosecutor as the items stolen from her home.
 {¶ 35} Patrolman Rayna Roe of the Wellsville Township Police Department then testified that she recognized Patton's vehicle and saw it parked near the Walkups' home between 7:00 and 7:30 on the night of August 18th. She said that as she drove by she could see that Patton was in the driver's seat and that Nicosia was in the passenger's seat. She identified a third figure in the back seat, but could not tell whether it was a dog or a person.
 {¶ 36} Partolman Kamerer testified that he pulled Patton over for speeding on August 18th at 10:26 p.m. At the time, Patton was in the driver's seat, Nicosia was in the passenger's seat, and Bone was in the back seat. They were all wearing black. Patrolman Kamerer saw a package of cigarettes of the same type stolen from the Walkup residence in the back seat. Patrolman Kamerer did not give Patton a speeding ticket that night since he received a call for a domestic dispute. Rather he gave Patton a verbal warning to watch his speed. Later, he was called to investigate the Walkup break-in. He saw that the back door was forced open and that the bedrooms had been ransacked. Because he had seen Patton and his friends earlier that night, he immediately suspected them, even though there was no sign of Patton at the scene.
 {¶ 37} Bone then testified against Patton pursuant to a plea bargain. He testified that on August 18th, two girls, Katherine Dougherty and Dawn Higgins, came to visit him at his home sometime in the afternoon. Bone had only known the girls for a couple of months. They visited until around 6:00 or 7:00 in the evening, when Nicosia walked up to Bones' home. Bone and Nicosia had known each other for quite a few years. At about 10:00 that night, Patton drove to Bone's home. Patton asked Bone and the girls to watch his dog while Nicosia left with him. About 30-45 minutes later, Nicosia and Patton returned and asked Bone to leave with them. Nicosia suggested they all drive out to the Walkup home so Nicosia could see his ex-girlfriend, the Walkups' daughter. When they got to the Walkup home, Nicosia and Patton went inside while Bone stayed at the car. After a few minutes, Nicosia and Patton came back outside empty-handed. While driving back to his home, the group was stopped by Patrolman Kamerer for speeding. Bone testified the cigarettes were in the back seat, but had already been there when he got into the car.
 {¶ 38} Patton then dropped Nicosia and Bone off at Bone's home and left. Nicosia left for a little bit, but returned soon thereafter. Bone, Nicosia, and the girls then spent a night at a local motel, which Nicosia paid for with cash. Later, Nicosia gave Bone a box wrapped in electrical tape and asked him to give the box to Dougherty. Bone gave the box to Dougherty as requested without looking into it.
 {¶ 39} Dougherty testified that she and Higgins hung out with Bone in the summer of 2003. On August 18th, she and Higgins visited Bone in the early afternoon. Nicosia stopped by in the late afternoon/early evening and after he arrived, they all left for a bit. When they all returned to Bone's home, Nicosia left for a little bit, saying he had something to do. Nicosia came back a while later, but then left again. Bone left them later. At some point in the evening, Patton stopped by to pick up Nicosia. He asked Bone and the girls to watch his dog and returned with Nicosia about 15-30 minutes later. Bone then left with both Nicosia and Patton. Dougherty believed they all left at about 9:00 that evening. They all returned about 30 minutes later, when Patton retrieved his dog and left.
 {¶ 40} Dougherty testified that Patton, Nicosia, and Bone were all wearing black shirts. She did not see Patton's pants, but testified that the other two were wearing dark pants. When they returned, Nicosia was carrying a black duffle bag. After they returned, Bone and Nicosia went into a room by themselves for 5-10 minutes. When the boys came out, they all got drunk and went to a motel. Nicosia paid for a room with a Jacuzzi tub.
 {¶ 41} A couple of days later, Bone gave a box wrapped in electric tape to Dougherty and told her to look in the box. He told her that the things in the box had been stolen. A couple of days later, Dougherty took the box to the police.
 {¶ 42} In his defense, Patton first presented the testimony of his sister, Candi. She testified that Patton lives with her and that on August 18th he was at her house with Nicosia. She said that at about 9:00 that night, Patton and Nicosia stopped by and she cooked dinner for them. She then left the home at about 10:00 that night and that Nicosia and Patton were getting ready to leave at that time. She further testified that Patton did not have a black shirt and that his car had been customized to look better.
 {¶ 43} Finally, Patton testified in his own defense. He testified that he had not seen Nicosia on August 18th before picking him up at Bone's home. He thought he picked Nicosia up a little before 9:00 that night. He and Nicosia then drove to his sister's house for dinner. He and Nicosia then returned to Bone's home and left his dog with the girls so he and the boys could play basketball. The three then went for a ride so Nicosia could smoke marijuana. While driving, he was pulled over by Patrolman Kamerer for speeding, but he says Patrolman Kamerer was not near enough to see in the vehicle before he got called to the domestic disturbance. He then dropped Bone and Nicosia off at Bone's home and went home. He testified that while they were driving, Bone said that he "did a job" earlier, which Patton understood to mean that he had broken into a home and stolen something. He further testified that he did not own a black shirt.
 {¶ 44} Nicosia testified that he was not near the Walkup home that night and accused every one of the State's witnesses of lying.
 {¶ 45} Given these facts, the jury did not clearly lose its way when it found Patton guilty of burglary and theft. There are certainly inconsistencies in the testimony, but these inconsistencies do not call the jury's verdict into question.
 {¶ 46} Patton denied being near the Walkup home, but Patrolman Ray testified that she saw him in the front seat of his car parked near the home that evening. Furthermore, Bone testified that Patton drove them all to the Walkup home and entered the home with Nicosia.
 {¶ 47} Bone claimed that Patton and Nicosia were empty-handed when they left the Walkup home, but Dougherty said that Nicosia was carrying a black duffle when the boys returned, that he and Bone were in a room alone after coming back, that Nicosia told Bone to give her the box containing the stolen items, and that when Bone told her the things were stolen when he gave her the box.
 {¶ 48} Patton's sister attempted to provide Patton with an alibi. But the jury could have disbelieved the alibi. In any event, even if Patton had eaten dinner with Nicosia at his sister's that night, he had plenty of time to commit these offenses.
 {¶ 49} In conclusion, there is evidence that Patton was near the Walkup home on the evening of August 18th, that he and Nicosia entered the Walkup's locked home that night, that Nicosia possessed items stolen from the Walkup home later that night, and that Patton lied when discussing his whereabouts and actions that night. While there is no direct evidence connecting Patton to both the burglary and theft, the circumstantial evidence supports the jury's verdict. Patton's arguments to the contrary are meritless.
 Conclusion {¶ 50} Patton argues that his conviction should be reversed since evidence which was not produced in discovery as requested was introduced into the record. But the trial court did not abuse its discretion when it allowed the State to introduce the evidence after a suppression hearing. Furthermore, that Patton's conviction is not against the manifest weight of the evidence. Patton's arguments are meritless. The judgment of the trial court is affirmed.
Vukovich, J., Waite, J., concurs.